Opinion filed March 1, 2007


















 
 
  
 
 







 
 
  
 
 




Opinion filed March 1, 2007

 

 

 

 

 

 

 

 In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-05-00220-CV 

                                                    __________

 

                            JOYCE
AND BRUCE PARKER, Appellants

                                                             V.

THREE RIVERS FLYING SERVICE, INC. AND HAROLD

GRIFFITH FLYING SERVICE, INC., Appellees

 



 

                                         On
Appeal from the 118th District Court

                                                        Howard County,
Texas

                                                    Trial
Court Cause No. 42570

 



 

                                                                   O
P I N I O N

Joyce and Bruce Parker brought this personal
injury action against the Texas Boll Weevil Eradication Foundation, Inc.; Three
Rivers Flying Service, Inc.; and Harold Griffith Flying Service, Inc.  The Parkers=
claims arose in connection with aerial pesticide applications.  In an earlier accelerated appeal, this court
upheld the trial court=s
order dismissing the Foundation from the suit on sovereign immunity grounds.[1]  In this appeal, the Parkers contend that the
trial court erred in granting Three Rivers=s
and Harold Griffith=s motions
for summary judgment.  We affirm.

 

 








                                                                    Background

The Texas Legislature has recognized that the
insects known as the boll weevil and the boll worm are menaces to the Texas cotton industry
and that their eradication is a matter of public necessity.  See Tex.
Agric. Code Ann. '
74.101 (Vernon
Supp. 2006).  The legislature has
designated the Foundation, a nonprofit corporation, as the entity to plan,
carry out, and operate eradication programs to eliminate these insects.  See Tex.
Agric. Code Ann. '
74.1011 (Vernon 2004).  In an effort to
eradicate these insects, the Foundation employs aerial sprayers, such as Three Rivers
and Harold Griffith, to disperse insecticides on cotton crops.  The Foundation entered into contracts with Three Rivers
and Harold Griffith for the aerial application of the insecticide
malathion.  Under the contracts, Three Rivers
and Harold Griffith are independent contractors of the Foundation.  See Parker v. Tex. Boll Weevil Eradication
Found., Inc., No. 11-04-00085-CV, 2005 WL 309562, *4 (Tex. App.CEastland, Feb. 10, 2005, pet. denied).

This cause involves two separate aerial
applications.  The Parkers alleged that
on June 7, 2001, Three Rivers was negligent in performing an application of
malathion and that on September 19, 2003, Harold Griffith was negligent in
performing an application of malathion. 
The Parkers also alleged that Joyce Parker was exposed to malathion as a
result of the negligence and that she suffered personal injuries as a result of
the exposures.








On December 24, 2003, Harold Griffith filed a
no-evidence motion for summary judgment. In the motion, Harold Griffith
asserted that there was no evidence that it was negligent in performing the aerial
application in question and that there was no evidence that the alleged
exposure to malathion caused any injury or damages to the Parkers.  On January 9, 2004, Three Rivers filed a
traditional motion for summary judgment and a no-evidence motion for summary
judgment.  In the no-evidence motion,
Three Rivers asserted that there was no evidence (1) that it was negligent in
performing the aerial application in question, (2) that it breached any duty to
the Parkers, and (3) that it caused the Parkers=
alleged damages.  In the traditional
motion, Three Rivers asserted that it was entitled to sovereign immunity.  On March 11, 2004, the trial court entered an
order staying and abating this cause pending the resolution of the Parkers= accelerated appeal against the
Foundation. The abatement order provided that matters contrary to the abatement
could be conducted by a Rule 11 agreement between the parties.  See Tex.
R. Civ. P. 11.  On June 2, 2005,
during the abatement period, the trial court entered its order granting summary
judgment to Three Rivers and to Harold Griffith.  The trial court=s
order granting summary judgment did not specify the ground or grounds relied on
for its ruling.

                                                     Issues
Presented

The Parkers present five issues for review.  In their first three issues, the Parkers
contend that the trial court erred in granting summary judgment for the
following reasons: (1) the abatement order precluded the trial court from
ruling on the motions for summary judgment during the abatement period; (2) the
doctrine of res ipsa loquitur precluded summary judgment; and (3) the summary
judgment evidence raised fact issues on their claims.  In their fourth issue, the Parkers assert
that the trial court erred in granting summary judgment to the extent it
granted summary judgment on sovereign immunity grounds.  In their fifth issue, the Parkers contend
that Three Rivers and Harold Griffith waived their
objections to the summary judgment evidence by failing to obtain a written
ruling on the objections.

                                                                 Abatement
Issue

The Parkers argue that the trial court=s order granting summary judgment was
void and a legal nullity because the trial court signed the order during the
abatement period.  The Parkers rely on In
re Kimball Hill Homes Texas, Inc., 969 S.W.2d 522, 527 (Tex. App.CHouston [14th Dist.] 1998, no pet.),
and Lumbermens Mutual Casualty Co. v. Garza, 777 S.W.2d 198, 199 (Tex.
App.CCorpus
Christi 1989, no pet.).  These cases
stand for the proposition that the abatement of a case precludes the trial
court from going forward on the case and prohibits the parties from proceeding
in any manner in the case until the case has been reinstated.  Kimball Hill Homes, 969 S.W.2d at 527;
Garza, 777 S.W.2d at 199.  The
courts in these cases recognized that the trial court has discretion in
drafting abatement orders to allow the court and the parties to proceed on
matters as specified in the abatement order. 
Kimball Hill Homes, 969 S.W.2d at 527 (AUnless
otherwise specified in the abatement order, any action taken by the court or
the parties during the abatement is a legal nullity.@);
Lumbermens, 777 S.W.2d at 199 (AOf
course, a trial court may, in its discretion, draft an abatement order which would
allow the parties to file discovery requests.@).








In this cause, the trial court=s abatement order related to the
Parkers=
accelerated appeal against the Foundation. 
The order provided that all deadlines and trial settings were to be held
in abeyance pending the resolution of the appeal between the Parkers and the
Foundation.  The order also specifically
provided that A[a]dditional
matters contrary to this Order may be conducted by Rule 11 agreement between
all of the parties.@  Therefore, the language in the order clearly
allowed the trial court and the parties to proceed with the motions for summary
judgment Aby Rule
11 agreement.@  Based on the reasoning in Kimball Hill
Homes and Lumbermens, the trial court had the discretion to
draft the abatement order in this fashion. 
Kimball Hill Homes, 969 S.W.2d at 527; Garza, 777 S.W.2d
at 199.

An agreement may comply with Rule 11 in either of
two ways: (1) be in writing, signed, and filed with the papers as part of the
court=s record
or (2) be made in open court and entered of record.  See Rule 11; Breceda v. Whi,
187 S.W.3d 148, 153 (Tex.
App.CEl Paso
2006, no pet.).  The record in this cause
supports the conclusion that the Parkers=
counsel agreed to go forward on the motions for summary judgment.[2]  However, the record does not contain an
agreement on the issue complying with Rule 11.

 The Parkers
did not object in the trial court to proceeding with the hearing on the motions
for summary judgment.[3]  They did not assert that the lack of a Rule
11 agreement prohibited the trial court and the parties from proceeding with
the motions.  To preserve a complaint for
appellate review, a party must present to the trial court a timely, specific
request, objection, or motion.  Tex. R. App. P. 33.1(a).  By failing to object on the basis of a lack
of a Rule 11 agreement in the trial court, the Parkers failed to preserve error
on the abatement issue for appeal.  Id.  We overrule the Parkers= first issue.

Summary Judgment Issues








Three Rivers and Harold Griffith moved for summary
judgment on multiple grounds, including the ground that there was no evidence
that they were negligent in performing the aerial applications in
question.  The trial court granted Three
Rivers=s and
Harold Griffith=s motions
for summary judgment without specifying the ground or grounds upon which it
relied in granting the motions.  When a
trial court=s order
granting summary judgment does not specify the ground or grounds relied upon
for its ruling, summary judgment will be affirmed on appeal if any of the
summary judgment grounds advanced by the movant are meritorious.  Dow Chem. Co. v. Francis, 46 S.W.3d
237, 242 (Tex. 2001); Carr v. Brasher,
776 S.W.2d 567, 569 (Tex.
1989).

We must review a no-evidence summary judgment
under the same standard as a directed verdict. 
King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003).  Accordingly, we examine the record in the
light most favorable to the nonmovant and disregard all contrary evidence and
inferences.  Id.;
Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002).  A trial court must grant a proper no-evidence
motion for summary judgment unless the nonmovant produces more than a scintilla
of probative evidence to raise a genuine issue of material fact.  Tex.
R. Civ. P. 166a(i); Wal-Mart, 92 S.W.3d at 506.

                                                   The
Summary Judgment Evidence

Stephen L. Moreno performed the June 7, 2001
aerial pesticide application while he was in the course and scope of his
employment with Three Rivers.  Terrie
Bradley, an employee for the Foundation, observed the June 7, 2001 application
from the Parkers=
driveway.  Bradley is referred to in the
record as a ground observer for the Foundation. 
During the application, Moreno
sprayed two adjacent cotton fields that were near the Parkers= property and house.  The Parkers filed the depositions of Moreno and Bradley as
summary judgment evidence.

Moreno
said that aerial applications may be made only when the wind speed is under ten
miles an hour.  He also said that
applications should not be made if the wind speed is over ten miles an hour
because of the potential for off-target drift of the pesticide to adjacent
properties.  Thus, Moreno testified that a reasonably prudent
applicator should not make an application if the wind is above ten miles an
hour.  Bradley also testified that
applications should not be performed if the wind is over ten miles an
hour.  Moreno also testified that, if wind speed
rises to over ten miles an hour during an application, the application is
aborted.








Moreno
testified in detail about the June 7, 2001 application.  Moreno
performed the application during the afternoon hours.  He said that the winds were very light that
day.  He testified that the treated
fields were about three hundred to four hundred feet away from the Parkers= house. Moreno said that, before he left the airport
to perform the application, he inspected the airplane to make sure that it was
safe for flight and also checked the spraying equipment on the airplane. Moreno testified that
Bradley, the ground observer, monitored the winds at the subject fields and
made sure that the fields were clear of people.

Moreno
and Bradley had direct radio contact with each other before and during the
application.  Moreno said that he relied on Bradley to tell
him wind speeds.  Moreno testified that Bradley told him the
wind was blowing less than ten miles an hour. 
Moreno
flew the airplane to the fields to perform the application.  Bradley testified that she made sure the
fields were clear of people and that the wind conditions were appropriate for
the application.  Bradley monitored the
wind speed with a wind meter.  Bradley
testified that the wind speed was appropriate for the application.  The record shows that Bradley recorded the
wind speed at seven miles an hour.

When Moreno
arrived at the subject fields, he circled the fields to examine them for
obstructions, people, and high lines.  Moreno determined that
everything was clear and also determined the safest path for performing the
application.  Moreno testified that he confirmed with
Bradley that the wind speed was still appropriate for the application.  Moreno
said that the wind was blowing in the direction of the Parkers= house.

Moreno
performed the application while flying the airplane about three to four feet
above the cotton canopy.  Moreno testified that the
safest way to make the application included flying over the Parkers= house. 
He said that he flew over their house about six times.  He testified that he did not spray the
Parkers= house
with malathion.  He also testified that
he left a buffer zone in between where he stopped spraying in the fields and
the Parkers=
house.  Moreno said that the wind speed never
exceeded ten miles an hour during the June 7, 2001 application.

Bradley testified that, during the application,
she was located between the Parkers=
house and the fields that were being sprayed. 
She also testified that the fields were across a road from the Parkers= house and that the fields were
probably 300 feet or more away from their house.  She said that she did not see any evidence of
a drift during the application.  She also
said that she neither saw any signs of a chemical in the air nor smelled any
chemical in the air.








Joyce Parker testified that she heard the airplane
fly over her house during the June 7, 2001 application.  She said that, for an hour or more, the
airplane was flying over her house and turning around over the house.  She also said that she stayed inside the
house during the application and that she did not witness any of the
application.

The Parkers also submitted as summary judgment
evidence test results from a vegetative sample taken from their property on
June 8, 2001.  The sample showed the
presence of malathion.

Harold Griffith performed the September 19, 2003
application.  There is no testimony from
Griffith or a Foundation ground observer in the summary judgment record.  The Parkers submitted summary judgment
evidence showing that Griffith performed an
aerial pesticide application in a cotton field about 5.2 miles north of Big Spring on September
19, 2003.  With respect to this
application, the Parkers alleged that they were traveling on a highway near the
field that Griffith
was treating.  In an affidavit, Bruce
Parker stated that, as they were traveling on the highway, AHarold Griffith flew over the highway
and sprayed our vehicle with the poison they use to kill the boll weevil.@ 
The Parkers also submitted test results from a sample taken from their
windshield showing the presence of malathion.

The Parkers presented the deposition testimony of
Paul E. Sumner, their designated liability expert, in opposition to the motions
for summary judgment.  Sumner testified
that he was an extension agricultural engineer with the University of Georgia.  He was not a licensed pilot or an aerial
applicator.  His testimony primarily
focused on the June 7, 2001 application. 
He testified that the June 7, 2001 application did not involve a direct
spraying from the Three Rivers=s
airplane onto the Parkers=
property.  Rather, Sumner testified that
the application involved a Adrift@ of the malathion.  Sumner said that, when the Parkers= counsel contacted him, the Parkers= counsel asked him to look at
information concerning a drift case. 
Sumner also said that this case did not involve any problem with the
equipment used in the June 7, 2001 application.








Sumner testified that the potential for drift
relates primarily to sustained wind speeds. 
He explained that an off-target drift results from the size of the
buffer and the wind speed.  He said that
there is always some off-target movement when making an application.  He also said that the applicable standard of
care provides that applications be made with wind speed under ten miles per
hour and that the standard of care is designed to keep drift to a minimum.  Sumner testified that, if Moreno
made the application with wind speed under ten miles an hour, he did not breach
the standard of care as is set forth in Texas.  Sumner testified that, based on the
information that he had reviewed, Bradley said the wind speed was seven miles
per hour and Bradley told Moreno the wind speed was seven miles per hour.  

Sumner said that he believed the wind speed
exceeded ten miles an hour during the June 7, 2001 application.  Sumner said that the June 7, 2001 weather
records for Lubbock, Midland,
and Big Spring
all indicated that the wind was blowing more than ten miles an hour.  However, he also said that the wind speed in
Lubbock, which was about eighty miles away from the application site, and that
the wind speed in Midland, which was about forty miles away from the
application site, were not indicative of the actual wind speed at the
application site.  He said that Big Spring was about
eighteen miles from the application site. 
Sumner agreed that wind speeds increase as you go higher in
altitude.  Sumner said that he did not
know the altitude of the weather recording device at the Big Spring weather station.  Moreno
testified that the weather recording device at Big Spring sits on top of a hill.  Sumner testified that the weather record for Big Spring showed an
average wind velocity of 10.66 miles per hour on June 7, 2001, at 3:30 p.m.

Sumner identified other complaints that he had
with Moreno=s June 7, 2001 application.  For example, Sumner said Moreno flew directly over the Parkers= house without giving them advance
notice of the application.  However,
Sumner testified that he was unaware of any standard of care in Texas requiring an
aerial applicator to give advance notice of an application.  Sumner also testified that giving notice of
an application has nothing to do with how far a pesticide will drift. Sumner
also said that Moreno
should have left a larger buffer zone in between where he stopped spraying and
the Parkers=
house.  Sumner testified that 300 feet
would have been an adequate buffer. However, Sumner did not know of any
information promulgated by the Texas Department of Agriculture or any
regulation promulgated by the Foundation requiring a 300-foot buffer.  Sumner said that there was no Georgia
regulation or federal regulation requiring a 300-foot buffer.  After identifying his complaints about Moreno, Sumner testified that, if the evidence
demonstrated that Moreno made the application
with the wind speed under ten miles an hour and 
all other factors remained the same, Moreno did not breach the standard of care.








Sumner also testified about the September 19, 2003
aerial application.  He said that the
September 19, 2003 weather records for Big Spring showed wind speeds ranging
anywhere from five miles per hour to a little more than seven miles per
hour.  Sumner said that he had reviewed
the Parkers=
depositions and records from the Texas Department of Agriculture.  According to Sumner, the Parkers testified
that, as they were traveling along, an airplane flew overhead and material
appeared on their windshield.  He also
said that a sample taken from the windshield of the Parkers= vehicle showed malathion residue.  Sumner testified that, as of the date of
giving his deposition, he did not have enough information to determine whether
Harold Griffith did anything wrong during the September 19, 2003 application.  Sumner also testified that he did not have
enough information to determine whether the application involved a direct
spraying of the windshield, as opposed to an off-target drift.  Sumner said that he needed to know the size
of the buffer zone that Griffith
used during the application.

During questioning by the Parkers= counsel, Sumner testified that it is a
breach of the standard of care if you spray a person or a person=s yard with poison.  He also testified that it is a breach of the
standard of care if you spray poison onto the windshield of a car that is
traveling on the highway.

                                                     Does
Res Ipsa Loquitur Apply?

In their
second issue, the Parkers argue that the doctrine of res ipsa loquitur applies
to their claims and that, therefore, the trial court erred in granting summary
judgment.  Res ipsa loquitur means
Athe thing speaks for itself@ and applies Ain
certain limited types of cases when the circumstances surrounding the accident
constitute sufficient evidence of the defendant=s
negligence to support such a finding.@  Haddock v. Arnspiger, 793 S.W.2d 948,
950 (Tex.
1990).  The res ipsa loquitur doctrine
applies only when two factors are proved: (1) the character of the accident is
such that it would not ordinarily occur in the absence of negligence and (2)
the instrumentality causing the injury is shown to have been under the
management and control of the defendant. 
Id.  Res ipsa loquitur is not a separate cause of
action for negligence; instead, it is a rule of evidence by which negligence
may be inferred by the jury.  Id. 








The Parkers rely on Farm Services, Inc. v.
Gonzales, 756 S.W.2d 747 (Tex. App.CCorpus
Christi 1988, writ denied).  In Gonzales,
pesticide was suddenly and unexpectedly discharged from an airplane while an
aerial applicator was en route to treat an orchard.  Id.
at 749.  The pesticide fell onto the
plaintiff as he was working on a farm.  Id.  The discharge of the pesticide in Gonzales
occurred as a result of a defect or a problem with the airplane=s sprayer system.  Id.  In determining whether res ipsa loquitur
applied, the Gonzales court explained that Athe
sudden discharge of a large amount of concentrated, toxic pesticide by a
crop-dusting airplane en route to its destination is an event which ordinarily
would not occur in the absence of negligence.@  Id.
at 752.  The court also explained that
the defendants had management and control over the airplane=s sprayer mechanism.  Id.  Therefore, the court held that res ipsa
loquitur applied and that the application of res ipsa loquitur supported the
jury=s
negligence findings.  Id.

This cause is distinguishable from Gonzales.  Gonzales involved the sudden and
unexpected discharge of pesticide resulting from a defect or failure in an
airplane=s
spraying equipment while the aerial applicator was en route to treat an
orchard.  Unlike Gonzales, this
cause does not involve a defect or failure of the airplane=s equipment.  Rather, this cause involves the judgments,
techniques, and skill the aerial applicators used in performing the
applications.  The primary issue in this
cause is whether the aerial applicators breached the applicable standard of
care during the applications.  Sumner testified
that there is always some off-target movement of pesticide when making an
application and that the applicable standard of care is designed to keep drift
to a minimum.  This testimony established
that drifts of pesticide occur in the absence of negligence.  Because
some drift occurs in every application, the Parkers cannot establish that the
character of the alleged accident B the drift of pesticide B does not ordinarily occur in the absence
of negligence.  The Parkers presented no
summary judgment evidence that the drift of pesticide does not ordinarily occur
in the absence of negligence.  Therefore,
we find that the doctrine of res ipsa loquitur does not apply in this cause.  We overrule the Parkers= second issue.

                                                     Expert
Testimony Requirement

The
facts in this cause are similar to those addressed in Hager v. Romines,
913 S.W.2d 733 (Tex. App.CFort Worth 1995, no pet.).  In Hager, an aerial applicator applied
herbicide to a field nearby the plaintiffs= property. 
Id.
at 734.  On the date of the application,
the plaintiffs noticed damage to their plants. 
Id.  In a suit against the aerial applicator,
the plaintiffs claimed that the aerial applicator had been negligent in
applying the herbicide to the nearby field and that their plants had been
damaged as a result of  the negligence.  Id.  The Hager court held that expert
testimony was necessary to establish the standard of care in the aerial
application of herbicide and the breach of the standard of
care.  Id. at 734-35.  The court explained the rationale for its
holding:








Expert testimony is necessary when the
alleged negligence is of such a nature that it is not within the experience of
a layman.  Roark v. Allen, 633
S.W.2d 804, 809 (Tex.
1982).  Not only is flying an airplane
not within the realm of experience of the ordinary, prudent person or juror,
applying herbicide and pesticide aerially requires use of specialized equipment
and techniques that are not familiar to the ordinary person.  

 

Id. at 735; see also Foust v. Estate of
Walters, 21 S.W.3d 495, 505 (Tex.
App.CSan Antonio 2000, pet. denied) (a
negligence claim against an aerial applicator must be established with expert
testimony).

We agree
with the sound reasoning of the Hager court.  Therefore, we hold that the Parkers were required
to establish with expert testimony the applicable standard of care and breach
of the standard of care.  The Parkers
attempt to distinguish Hager from this cause because Hager
involved a pesticide drift that damaged crops and not a pesticide drift that
caused injury to people.  However, the
reasoning of Hager applies equally to personal injury and property
damage cases.

                    Did the Summary Judgment
Evidence Raise a Fact Issue?

In their
third issue, the Parkers assert that the trial court erred in granting the
no-evidence motions for summary judgment because they raised fact issues in
response to the motions.  In their brief,
the Parkers assert that Sumner=s expert testimony raised fact issues as to
whether Three Rivers and Harold Griffith breached the standard of care in the
following ways: (1) by spraying the Parkers=
property with poison; (2) by spraying Joyce Parker with poison; (3) by spraying
the windshield of the Parkers= car with poison; (4) by flying in winds
that exceeded ten miles an hour; and (5) by failing to notify the Parkers of
the aerial application.

With
respect to the first three breaches listed above, the Parkers rely on Sumner=s testimony (1) that it is a breach of the standard of care if you spray a
person or a person=s yard
with poison and (2) that it is a breach of the standard of care if you spray
poison onto the windshield of a car that is traveling on the highway.  However, Sumner did not testify that Three
Rivers directly sprayed the Parkers=
property or Joyce Parker with malathion or that Harold Griffith directly
sprayed the windshield of the Parkers=
car with malathion.  Rather, Sumner
testified that the Three Rivers application involved an off-target drift, as
opposed to a direct spraying.  Sumner
also testified that he did not have enough information to determine whether the
Harold Griffith application involved a direct spraying.  Thus, the Parkers did not present expert
testimony that Three
 Rivers or Harold Griffith
directly sprayed them or their property with malathion.  In the absence of such testimony, the Parkers
failed to raise fact issues on the first three breaches listed above.








Next, the Parkers contend that Sumner=s testimony raised a fact issue as to
whether Three Rivers=s
pilot, Moreno,
breached the standard of care by flying in winds that exceeded ten miles an
hour.  Sumner testified that, if Moreno made the application with wind speed under ten
miles an hour, he did not breach the standard of care as is set forth in Texas.  The summary judgment evidence showed that
Bradley recorded the wind speed at seven miles an hour and that Bradley told Moreno the wind speed was
seven miles per hour.  Sumner testified
that, based on the weather records for Lubbock, Midland, and Big Spring, he
believed the wind speed exceeded ten miles an hour during Moreno=s application.  However, Sumner testified that the wind
speeds in Lubbock and in Midland were not indicative of the actual
wind speed at the application site.  The
weather records for Big Spring showed an average wind velocity of 10.66 miles
per hour on June 7, 2001, at 3:30 p.m. Sumner said that wind speeds increase as
altitude increases and that he did not know the altitude of the weather
recording device in Big Spring.  Moreno testified that the weather recording device at Big Spring sits on top of
a hill.  Although Sumner believed the
wind speed exceeded ten miles an hour at the application site, the Parkers
presented no summary judgment evidence showing that the wind speed was above
ten miles an hour at the application site. 
Therefore, the Parkers presented no evidence that Moreno performed the application in wind
exceeding ten miles an hour.

Likewise, there was no summary judgment evidence
that the wind speed exceeded ten miles an hour during Harold Griffith=s aerial application.  Sumner testified that the September 19, 2003
weather records for Big Spring showed wind speeds ranging anywhere from five
miles per hour to a little more than seven miles per hour.

The Parkers also assert that Moreno breached the standard of care by
failing to notify them of the application. 
Although Sumner testified that Moreno
should have notified the Parkers of the application, he also testified that he
was unaware of any standard of care in Texas
requiring an aerial applicator to give advance notice of an application.  Therefore, Sumner=s
testimony provided no evidence that such a standard of care exists in Texas.  Additionally, Sumner further testified that
giving notice of an application has nothing to do with how far a pesticide will
drift.








Sumner also testified that Moreno should have left a larger buffer zone
in between where he stopped spraying and the Parkers=
house.  Sumner said that a 300-foot
buffer would have been adequate. 
However, Sumner also said that he did not know of any information
promulgated by the Texas Department of Agriculture or any regulation
promulgated by the Foundation requiring a 300-foot buffer.  Sumner=s
testimony provided no evidence that a standard of care exists in Texas requiring a
300-foot buffer zone.

Sumner testified that, if the evidence
demonstrated that Moreno made the application
with wind speed under ten miles an hour, and all other factors remained the
same, Moreno
did not breach the standard of care. 
There was no summary judgment evidence that the wind speed exceeded ten
miles an hour at the application site.  The Parkers failed to meet their summary
judgment burden of establishing with expert testimony that Moreno breached the applicable standard of
care.  Sumner also testified that
he did not have enough information to determine whether Harold Griffith did
anything wrong during the September 19, 2003 application.  The Parkers failed to meet their summary
judgment burden of establishing with expert testimony that Harold Griffith
breached the applicable standard of care.[4]

The Parkers failed to raise a fact issue on
whether Three Rivers and Harold Griffith breached the
standard of care.  Therefore, the trial
court did not err in granting Three Rivers=s
and Harold Griffith=s
no-evidence motions for summary judgment. 
We overrule the Parkers=
third issue.

                                                             Parkers= Other Issues

Based on our disposition of the Parkers= first three issues, we need not
address their fourth issue (that the trial court erred to the extent it granted
summary judgment on sovereign immunity grounds).  Tex.
R. App. P. 47.1.  With respect to
the Parkers= fifth
issue (that Three
 Rivers and Harold
Griffith waived their objections to the summary judgment evidence by failing to
obtain a written ruling on the objections), we note that we did not consider
any of the objections in our review of the record.  Otherwise, we do not address the Parkers= fifth issue.

                                                               This
Court=s Ruling

 We
affirm the judgment of the trial court.

 

March 1, 2007                                                             TERRY
McCALL

Panel consists of:  Wright, C.J.,                                     JUSTICE

McCall, J., and Strange,
J.











[1]See Parker v. Tex. Boll Weevil Eradication Found., Inc., No. 11-04-00085-CV, 2005 WL 309562 (Tex. App.CEastland, Feb. 10, 2005, pet. denied).





[2]The record shows that the parties proceeded with
various matters during the abatement period. 
On April 29, 2004, the parties deposed the Parkers= designated liability expert.  On July 19, 2004, the Parkers filed
supplemental summary judgment evidence in opposition to Three Rivers=s and Harold Griffith=s motions
for summary judgment.  Three Rivers and
Harold Griffith both state in their appellate briefs that counsel for the
parties, including the Parkers= counsel, agreed to go forward with a hearing on the
motions for summary judgment and that, on November 8, 2004, the trial court
held a hearing on the motions.  This
court has received correspondence from the court reporter indicating that there
was no reporter=s record for the November 8, 2004 hearing.  Thus, there is no reporter=s record of the hearing in the appellate record.  However, the Parkers have not denied (1) that
their counsel agreed to go forward with the November 8, 2004 hearing on the
motions for summary judgment, (2) that the trial court heard the motions on
November 8, 2004, or (3) that their counsel participated in the hearing.





[3]The Parkers did not raise the abatement issue in the
trial court until after the trial court entered the summary judgment
order.  The Parkers raised the abatement
issue in a June 6, 2005 letter to the trial court.  In the letter, the Parkers asserted that any
ruling by the trial court during the abatement period was void and a legal
nullity and that, therefore, the trial court=s summary
judgment order was void.  The Parkers did
not raise the issue of a lack of a Rule 11 agreement in the June 6, 2005
letter.





[4]The Parkers cite Lauderdale v. Texas Department of
Agriculture, 923 S.W.2d 834 (Tex. App.CAustin
1996, no pet.), in arguing that the summary judgment evidence raised a fact
issue on their negligence claim against Harold Griffith.  Lauderdale involved a judicial review
of an administrative penalty against an aerial applicator.  Id.
at 836-37.  The issue in Lauderdale
was whether the aerial applicator had exposed motorists to pesticide on a
certain date.  Id.  Lauderdale did not involve a negligence
claim against the aerial applicator. 
Therefore, the issue of the type of evidence necessary to establish a
breach of the standard of care was not before the court.